WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Arturo Contreras Soto,<br><br>Defendant. | No. CR-24-02929-001-TUC-JGZ (JR)<br><br>**ORDER** |

Pending before the Court is a Report and Recommendation (R&R) (Doc. 36) issued by United States Magistrate Judge Jacqueline Rateau recommending the Court deny Defendant's Motion to Suppress Evidence Illegally Seized (Doc. 25). Defendant filed an Objection to the R&R (Doc. 38), and the Government filed a Response (Doc. 40). For the following reasons, the Court will overrule the Defendant's Objection and accept the Magistrate Judge's recommendation to deny the Defendant's Motion to Suppress.

**I.    STANDARD OF REVIEW**

When reviewing a magistrate judge's R&R, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original). District courts are not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *see also* 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

## II. FACTUAL AND PROCEDURAL HISTORY

The R&R details the facts underlying Defendant's arrest and the search of his satchel. (Doc. 36 at 1–4.) Because neither party objects to this factual portion of the R&R, the Court will adopt it in its entirety. For the purposes of this Order, the Court briefly summarizes the relevant history.

On April 2, 2024, members of the Tucson Police Department's (TPD) Community Response Team (CRT) saw Defendant Arturo Contreras Soto riding an electric bicycle while carrying an open container of alcohol, a Class 2 misdemeanor in Arizona. (*Id.* at 2.) The officers stopped Soto, gave him a warning, and released him, but determined they would arrest Soto if they observed him committing a similar infraction again. (*Id.*)

The following day, April 3, 2024, TPD Officers Still and Rodriguez and Detective Demasi were conducting surveillance in the same area when they again observed Soto riding an electric bicycle with an open container of alcohol. (*Id.*) This time Officer Still stopped Soto, with the assistance of Officer Rodriguez and other uniformed and plain clothes officers who were present in the area. (*Id.* at 2–3.) Officer Still approached Soto, who was wearing a satchel across his chest, and handcuffed him with his hands behind his back. (*Id.* at 3.) Soto remained seated on his bicycle while Officer Still removed the satchel and placed it 12 to 15 feet away on the hood of a police car. (*Id.*) Soto stated that he did not want the officers to search the satchel, and Officer Still responded that he was putting the satchel in a safe place. (*Id.*) At this point, many of the officers left the scene. (*Id.*)

Officer Still then contacted his supervisor to confirm the plan to charge Soto with a misdemeanor offense and book him into jail. (*Id.*) The supervisor gave approval, and before placing Soto in his police vehicle, Officer Still searched Soto's satchel and found a handgun with an empty chamber and a loaded magazine. (*Id.*) Soto was subsequently charged with one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8). (Doc. 31 at 3.)

In the Motion to Suppress, Soto argues evidence of the handgun must be suppressed

because Officer Still's warrantless search of his satchel violated his Fourth Amendment right to be free from unreasonable searches and seizures. (Doc. 25 at 3–5.) Soto contends that the search did not meet the criteria of the search incident to a lawful arrest exception to the warrant requirement. (Doc. 25.) The government argues that the search was legal both as a search incident to a lawful arrest and as an inventory search. (Doc. 31 at 3–7). On September 13, 2024, an evidentiary hearing was held before Magistrate Judge Rateau, during which Officer Still testified and the government introduced body cam footage of the arrest. (Doc. 36 at 1; Doc. 33.) Following the hearing, Judge Rateau issued an R&R recommending that this Court deny Soto's Motion to Suppress. (Doc. 36 at 8.) Judge Rateau found that the search was legal as an inventory search, but not as a search incident to arrest, and that the handgun would have inevitably been discovered.[1] (*Id.*)

On September 30, 2024, Soto filed an Objection to the Magistrate Judge's conclusion that the search was a permissible inventory search and the handgun would have inevitably been discovered. (Doc. 38 at 2.) Because there is no objection to the Magistrate Judge's conclusion that the search did not qualify as a valid search incident to a lawful arrest, the Court does not address that issue.

**III.   Officer Still's Search of the Satchel Was a Legal Inventory Search**

In his Objection, Soto asserts that the search "does not qualify as an inventory search" because (1) the search occurred in the field rather than at the police station, where "TPD had total control over the satchel" and "no exigency existed that required an immediate search," (2) the TPD policies that require officers to search an arrestee's person

---

[1] In reaching this conclusion, Judge Rateau stated that the Government had met its burden to prove the weapon found in Defendant's satchel inevitably would have been discovered notwithstanding the officers' invalid search incident to arrest. The inventory search and inevitable discovery exceptions to the warrant requirement are distinct doctrines, although they often overlap. The government did not argue that the firearm would have inevitably been found, (*see* Doc. 31), and, at the evidentiary hearing, Government counsel clarified this point, stating, "Here, it's not really inevitable discovery because, under the policies that officers are following, that [inventory] search is always done prior to transport." (Hr'g Tr. 54:16). The Government also does not rely on the inevitable discovery doctrine in its response to Defendant's Objection requesting this Court deny the Defendant's Motion to Suppress. (Doc. 40.) Thus, the Court does not rely on the inevitable discovery doctrine in adopting Judge Rateau's R&R. The Court reads the R&R as concluding that the gun was lawfully discovered through a valid inventory search.

and belongings for weapons prior to transport "cannot abrogate the Fourth Amendment" and are "unconstitutional," and (3) "the purpose of the search was to look for dangerous drugs and firearms." (*Id.* 3–5.) The Court agrees with the Magistrate Judge's conclusion that the search was a permissible inventory search and will overrule the Objection to this determination.

"The inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). Inventory searches serve to protect an owner's property while it is in police custody, insure against claims of lost, stolen, or vandalized property, and to protect the police from danger. *Florida v. Wells*, 495 U.S. 1, 4 (1990). After making a lawful arrest, inventory searches are permissible on property in the legitimate custody of the arresting officers in order to protect the officers from any danger that may be posed by the property. *See United States v. Mancera-Londono*, 912 F.2d 373, 376 (9th Cir. 1990).[2]

Police inventory procedures satisfy the Fourth Amendment if conducted according to standardized criteria and not in bad faith or for the sole purpose of investigation. *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019) (citing *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). The existence of standardized instructions is one of the most important features of the inventory search exception. *Snitko v. United States*, 90 F.4th 1250, 1261 (9th Cir. 2024). "Standardized" instructions for inventory searches need not be written but must limit the discretion of officers and apply consistently across cases. *Id.* This assures that the search would have occurred "regardless of the degree of suspicion an officer has of a person's . . . criminality." *Id.* Where the officer had, or may have had, dual motives for conducting an inventory search, e.g., producing an inventory of personal property and investigating for evidence, the search is valid if the officer's conduct would have been the same regardless of their subjective state of mind. *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993).

---

[2] The Court notes that one of the cases relied upon by the Magistrate Judge for this proposition, *United States v. Sapalasan*, 97 F.4th 657 (9th Cir. 2024), was withdrawn by the Ninth Circuit two days after Judge Rateau issued the R&R, and can no longer be cited as authority. *United States v. Sapalasan*, 2024 WL 4220688 (9th Cir. Sept. 18, 2024).

Here, the search of Soto's satchel was a permissible inventory search because the officers had lawful custody of the satchel, followed a standardized procedure, and conducted the search, at least partially, for the legitimate purpose of officer safety. First, the officers had lawful custody of the satchel after arresting Soto. The defense does not argue that the arrest was unlawful. The officers observed Soto committing a misdemeanor offense and had the authority to arrest him at that time. Instead, Soto argues that no exigency existed justifying an immediate search while TPD officers had total control of the satchel. (Doc. 38 at 3.) However, whether an exigency existed is an entirely separate exception to the warrant requirement and is immaterial to the inventory search exception analysis. Here, the key fact is that the officers had lawful custody of the satchel after lawfully detaining and arresting Soto and deciding to bring him to jail for booking. (Doc. 36 at 3, 7.)

Second, considering both TPD's written Arrest Policies and Officer Still's testimony regarding field inventory searches of arrestees, the search of Soto's satchel conformed to a standardized and established local procedure within the meaning of the inventory search exception. TPD's written Arrest Policies required the officers to search Soto's person and hand-carried items for weapons before transporting them in the police vehicle. (*See* Doc. 36 at 4; Doc. 40 at 3 (describing field arrest procedures in TPD General Order 2100); Ex. 1 at 34–35.) Also, Officer Still testified that once officers determine a person is going to be booked into jail, officers search the arrestee's entire person and any property they have with them. (Doc. 41, Hr'g Tr. 20:23–21:2.) If the hand-carried items contain evidence, contraband, or any other personal property, officers will inventory those items at the station. (*Id.* at 44:4–17.) That is what happened here; the officers searched Soto's person and property in the field, then, once they arrived back at the station, Officer Still took an inventory of Soto's property. (*Id.* at 41:21–42:9.) There is no reason to doubt Officer Still's testimony that officers would inevitably have searched Soto's satchel before booking him into jail. *See United States v. Antonio*, 386 F. App'x 678, 680 (9th Cir. 2010).[3]

---

[3] Notably, TPD's written Arrest Policies do not specifically describe an "inventory search" procedure that requires officers to catalog an arrestee's property prior to transport or at the

Soto attempts to distinguish the inventory search permitted by *Illinois v. Lafayette* because the search in that case happened at the police station rather than in the field, where the purposes of protecting law enforcement agencies from false claims and preventing contraband from entering jails are more aptly served. (Doc. 38 at 4–5.) However, the location of the search was not critical to *Lafayette*'s holding, and protecting officer safety is also a legitimate purpose for inventory searches. *Bertine*, 479 U.S. at 372–73; *see United States v. Chadwick*, 433 U.S. 1, 15 n.9 (1977) ("if officers have reason to believe that luggage contains some immediately dangerous instrumentality . . . it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon."). Moreover, the Ninth Circuit has upheld inventory searches that took place in the field, for safety reasons, rather than at a police station or impound lot. *See United States v. Feldman*, 788 F.2d 544, 553 (9th Cir. 1986) ("An on-the-spot inventory search of a car which an officer reasonably suspects may contain a gun is reasonable because it ensures the immediate protection of the public's safety"); *Antonio*, 386 F. App'x at 680 (upholding search where officers had lawful custody of defendant's backpack and testified that property taken into police custody is routinely inventoried for weapons prior to transport).

Third, the officers did not conduct the search solely for investigatory purposes. *United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020). The Court finds that some aspects of Officer Still's testimony and some of the circumstances surrounding the search support Soto's contention that the "purpose of the search was to look for dangerous drugs and firearms." (Doc. 38 at 4.) Officer Still testified that, prior to Soto's arrest, the CRT had information that Soto transported narcotics from the house they were surveilling, always

---

station. Most of the policies provided as justification for the search of Soto's satchel refer to "searches incident to arrest," not inventory searches. *See* Ex. 1 at 6, 34 (Policy 2114.3 Physical Arrest for Misdemeanors, Policy 2162.1 Field Arrest Search Procedures); Ex. 2 at 18 (Policy 2233 Searches Incident to Arrest). In fact, Arrest Policy 2163.1 "Pima County Jail Booking Procedures" instructs officers to place "a prisoner's property that will not be accepted by the jail (e.g., bedroll, knapsack, carrying bag, etc.) . . . in the appropriate outside storage bins in the booking parking lot," not to search and inventory the contents. Ex. 1 at 36. Although it would be advisable for TPD to promulgate more detailed written procedures for handling and taking an inventory of arrestees' property that place greater limitations on officer discretion, as noted above, a standardized inventory search procedure does not need to be written down. *Snitko*, 90 F.4th at 1261.

- 6 -

1  carried a firearm, had been to prison, and was not allowed to have a gun. (Hr'g Tr. 9:22–
2  10:8.) He testified that satchels like the one Soto wore "are very, very commonly used to
3  transport firearms and narcotics." (*Id.* at 15:1–8.) Also, Officer Still testified that Soto
4  became agitated and concerned that officers were going to search the satchel, which likely
5  added to Officer Still's suspicion of the satchel's contents. (*Id.* at 16:1–13). When asked
6  why officers are required to search an arrestee before transporting them, Officer Still
7  responded "to ensure that they don't have *any further evidence on them*, any weapons, any
8  prisoner contraband they could potentially introduce into the jail." (*Id.* at 46:22–47:1)
9  (emphasis added). Clearly, Officer Still expected to find evidence of a crime in Soto's
10 satchel.

11 Nevertheless, "[t]he standard for determining the permissibility of an inventory
12 search is whether the search would have occurred 'but for' the Government's allegedly
13 improper investigatory purpose." *Snitko*, 90 F.4th at 1263. TPD's Arrest Policies required
14 the officers to search Soto's hand-carried items for weapons prior to transporting him to
15 jail for booking. Therefore, the satchel would have been searched regardless of Officer
16 Still's subjective investigatory purpose. Additionally, Officer Still had a bona fide motive
17 in officer safety. Officer Still testified that "making sure that that satchel is secure with no
18 weapons was the main goal," (Hr'g Tr. 39:22–24), and safety was "one of the primary
19 concerns," (*Id.* at 49:23–50:12). When asked why it is important to search an arrestee's
20 hand-carried items before transporting them in the police vehicle, Officer Still responded,
21 "To ensure there [are] no weapons in the bag." (*Id.* at 23:15–22). Therefore, regardless of
22 any investigatory motive Officer Still may have had, investigation was not the *sole* purpose
23 behind the search. *See Garay*, 938 F.3d at 1112–13.

24 Soto cites *United States v. Anderson*, 101 F.4th 586 (9th Cir. 2024), as an analogous
25 case where the court found a purported inventory search unconstitutional because of the
26 officers' solely investigatory motive. In *Anderson*, the issue before the court was "whether
27 the deputies' deviation from the governing inventory procedure indicate[d] that they acted
28 . . . solely for investigative purposes." *Id.* at 594. After initiating a traffic stop, officers

discovered the defendant had an expired driver's license and told the defendant they had to tow and inventory his truck. *Id.* at 588–89. The governing procedure required the officers to complete two forms, "including an inventory of *any* personal property contained within the vehicle." *Id.* at 589 (emphasis in original). The officers found a firearm, which was the only piece of property included on the inventory forms. *Id.* The court held that the government "did not meet its burden to show that the deputies conducted an inventory search" because under the totality of the circumstances, no facts suggested the deputies were even partially motivated by administrative purposes. *Id.* at 593–94, 596.

The most salient facts in *Anderson* were: (1) the deputies inventoried only one piece of property, the firearm, i.e., the evidence used to convict the defendant, and omitted many other pieces of property found in the truck despite the non-discretionary nature of the policy that required an inventory of *all* property; (2) the deputies identified the firearm as "evidence" on the crime report, and photographic evidence of the truck's contents was included as part of the investigative police report, not as part of the inventory record; (3) the deputies had not arrested the defendant when the search was conducted but "clearly were suspicious that [defendant] had engaged in criminal behavior"; and (4) the deputies conducted the search almost immediately after discovering a basis for impounding the defendant's truck, while the defendant was handcuffed in the back of a patrol car, and did not remove or otherwise secure the defendant's personal property for safekeeping. *Id.* at 596–600.

Here, the key issue and circumstances are different enough from those in *Anderson* to warrant a different outcome. Soto challenges the constitutionality of the TPD Arrest Policies, and while he contends that the search was investigatory rather than for inventory purposes, he does not argue that Officer Still failed to follow the TPD policy of searching an arrestee's hand-carried items prior to transport. By contrast, in *Anderson*, the defendant argued that the officers' failure to follow the governing procedure rendered the search invalid. Next, although the officers in both cases were suspicious of criminal activity prior to the searches, Officer Still had confirmed the decision to arrest Soto, for a misdemeanor

unrelated to the evidence found during the search, before conducting the search. The officers in *Anderson* did not arrest the defendant until after searching the truck and finding the firearm. Moreover, Officer Still retained Soto's satchel and the other property and completed an inventory record after returning to the station.

Finally, Soto argues that "The TPD 'policy' authorizing officers to search a person's personal property, in the field, without any probable cause to do so, suborns the fundamental individual right to be free from unreasonable searches," and is "unconstitutional." (Doc. 38 at 5–6.) However, for the reasons discussed above, nothing in the case law suggests that a standardized policy providing for post-arrest, pre-transport searches of arrestees' property to protect officer safety and prepare for booking into jail is unconstitutional. For the foregoing reasons, the Court adopts the R&R's finding that Officer Still's search of Soto's satchel was a legal inventory search and will deny the Motion to Suppress on that basis.

**IT IS ORDERED:**

1. The Report and Recommendation (Doc. 36) is accepted in part and rejected in part.

2. Defendant's Objection (Doc. 38) is **overruled**.

3. Defendant's Motion to Suppress (Doc. 25) is **denied**.

Dated this 7th day of November, 2024.

_____
Jennifer G. Zipps
Chief United States District Judge